Good morning, Your Honors. My name is James Martin. I'm from the law firm Zelle. I represent PSD. I'd like to reserve five minutes for a but. Okay, please watch the clock. I am watching. Pacific Surf Designs designs, manufactures, and sells sheet wave machines. Those machines you see on the back of cruise ships or in amusement parks or standalone venues that mimic a sailing experience. And while I stand here for Pacific Surf Designs, I'm also here on behalf of fledgling competitors in numerous other industries that are faced with monopolists who seek to deter new rivals through conduct other than competition on the merits. Other than lower prices. Other than better services. Other than innovation. Monopolists who instead seek to raise rivals' costs and engage in other tactics to squelch competition. And that's what happened in this case. As soon as Pacific Surf Designs was formed, and I'm going to call it PSD, defendants embarked on a course of conduct that included the filing of meritless lawsuits that they offered to drop if PSD would stop competing, weaponizing those lawsuits to deter customers from doing business with PSD, and otherwise disparaging PSD and its founders. This appeal asked the question, by what standards should we evaluate the conduct of monopolists in these situations? We contend the court should apply the same standards that have been used for decades. In 1962, the Supreme Court in Continental War versus Union Carbide and Carbon wrote, plaintiffs must be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. So your objection is that you think the instructions allowed the jurors to compartmentalize the evidence, right? Because there was a sequence that they went through, and if they decided that the lawsuits that Whitewater filed were not objectively unreasonable, then they stopped the inquiry. But the district court also gave an instruction that the jurors should consider all of the evidence from all sources. So how is it that they were not instructed that they're considering all the evidence, which, as they went through that sequential list of instructions? Okay, so it was actually in the verdict form that the problem arises. Harm to competition is usually a single entry on the verdict form. Did defendant's conduct, anti-competitive conduct, allow the defendant to maintain monopoly power? Here, the jury verdict form had four questions. Question three was a form of a sham litigation instruction, which we have issues with as well because of the standard of proof. Question four. Because you want the the burden of proof to be shifted to Whitewater, for them to show that it was not objectively unreasonable and that they didn't have subjective bad intent in bringing in the lawsuits. Because as I read Hansgard 1, the plaintiff has the burden of showing sham litigation. But I understand your theory to be if you allege a monopoly broth, then you can shift the burden to the defendant. I don't. I hope that we didn't mean to say that. We sure didn't mean to say that. The burden of proof was on us to show that if you look at all of the evidence... By clear and convincing evidence. Not by clear and... By preponderance of the evidence. What's your best authority to say it's not... That it's a preponderance? Every case other than Hangard's. Hangard's was a case... Well, can you be a little more specific? Give me a Ninth Circuit case or a Supreme Court decision. It is... I know this case name. I'm blanking on it. City of Anaheim is one, where it was the overall combined effect. So are you suggesting that we have conflicting case law in the Ninth Circuit and it hasn't been considered en banc? I think that the only cases in which clear and convincing evidence has been used as the standard for sham litigation, apart from the policy. There's three parts. There's three tests for sham litigation. One is a single lawsuit where the patent was obtained by fraud and then used to exclude competitors. That's the Hangard's situation. That's bad faith prosecution. But it's not. As I recall, Hangard said... I forget what that test is called. It has a particular name. I'm sure you can remind me. But they said something to the effect of this is not that situation. And they went on to apply clear and convincing evidence. They applied clear and convincing evidence because of the facts of that case, where they were alleging that the fraud was obtained... I keep getting it backwards. Where the patent was obtained by fraud. And in patent law, when you are alleging that a patent was invalid, you have to show by clear and convincing evidence that the patent was obtained improperly or by fraud. That was the only reason clear and convincing evidence was used in Hangard. It was ported over from patent law. And in this case, we have lawsuits, only two of which involve patents. And one of those patents, I would argue, was found to be objectively baseless by the Patent Trial and Appeals Board and by the district court below. So I'd like to take you back to question three on the verdict form, because you identified that as the question... As the instruction that was in error. What should question three have said? Question three should not have existed. Okay, we should have gone from two to four? Question three, four, and five should not have existed. Question eight is the question that should have been asked. A simple question that's usually given in antitrust cases, whether defendants maintained or obtained monopoly power by virtue of anticompetitive conduct. So that's a very general question, right? So it doesn't provide any guidance to the jurors. You're alleging disparagement and sham litigation. The guidance to the jurors would be in the jury instructions, where they would be instructed the difference between competition on the merits and anticompetitive conduct. And competition on the merits has... It's well defined. So the instructions to the jury, but not the verdict form, could have had questions about the prior litigation, whether it was objectively baseless and pursued in bad faith. The instruction that we proposed was one that allowed the jury to hear... To understand what the difference between anticompetitive conduct and pro-competitive conduct was. I'm having a hard time understanding why it's appropriate to instruct the jury in the written and oral instructions about objectively baseless and prior litigation and bad faith. But it's not appropriate to put it on a verdict form. I keep being drawn into this objectively baseless argument and we're not saying that it should have been. That is our second argument. Our primary argument is objectively baseless wouldn't have been part of it. And that's because you think POSCO applies for a series of cases? That's because we believe Continental Or applies. That is the monopoly broth, for lack of a better term. That's the most colorful phrasing. Where one component of this conduct was the assertion of patent litigation, but it was also the weaponization of those lawsuits. It was also going after PST in the market. But that sounds like your run of the mill sham litigation allegation. Well, the run of the mill sham litigation, well, if we're going to limit it to just the POSCO, we're not limiting it to a single lawsuit, which is not this case, that's hand cards. What about a relevant group? I'm sorry? What about a relevant group? A relevant group? Yeah. How do you distinguish that? Relevant group is... I watched the oral argument yesterday and I know that you're part of that opinion. My understanding of that case was it is different on its facts. It was very CEQA specific. It was one in which the batting average for the plaintiff was zero. I don't think they won a single one of those cases. They settled. Whereas in our case, the batting average is 1000%. The defendant won zero of the cases. But the point of relevant group was to address the counting exercise that the district court had engaged in and said, yeah, that's okay. It seems elementary, but it works because in POSCO you had 29 lawsuits and in relevant group you had four. And the panel parsed through all of the allegations and limited it to the ones that were most like litigation, because there were a lot of allegations about administrative actions and writing a letter and all sorts of things, and then determined which of these were most like a traditional lawsuit. So four, and you're alleging five, not 29. So five seems a lot closer to four than 29. So I would... I was thinking about this this morning. A series to me is three or more. But that's not allowed under relevant group. It wouldn't be three or four. And I think that the law has been, unless relevant group changed it, I didn't see that it's not a pure counting exercise, that it's more to sham than quantity. It's also a qualitative analysis. And you have to... So... And that's another issue that I think I take issue with your count of five, because the first two actions were dismissed and there was a tolling agreement and... Voluntarily dismissed. PSG did not win that. It was a tolling agreement. They were refiled as one, so we have the same allegations, the same claim. You're counting that as three. It could be counted as one. Then one of them is dismissed for standing. The other is dismissed from some... The patent board who decided the patent was valid. It's refiled again, so it could still be counted as one at this point, and you're counting that as four. And then there's a separate contract action. So I get to two when I count the actions here. I think that the... We have to think about the effect of these lawsuits, not necessarily just the claims. And first of all, they didn't refile the same claims. The original lawsuits also alleged fraud, tortious interference, trade secret stealing, theft of confidential information. Those were never brought back again. The reason they weren't brought back again, we allege, is they were out in the marketplace telling people that PSG had stolen their designs. They were telling people PSG would not survive this litigation. They didn't have the resources. If you bought a PSG machine, they're not gonna be around to service it. You need to service these machines. So there were additional claims for which they've never offered any basis that it was objectively bitten. So companies can issue press releases about litigation, right? So how is this different if they are talking to a potential customer and saying, we're in litigation with this entity, which was a truthful statement, right? How does that become disparagement? Because they weren't just telling them they were in litigation. They were telling them that they'd stolen the trade secrets, that they're not gonna be able to survive these lawsuits. So they're stating the contents of the publicly filed complaints? I believe so, yes. Yeah. So... Okay. Go ahead. Do you wanna save some time for rebuttal? I'm sorry? Do you want to save time for rebuttal? I do wanna save my time for rebuttal, but I don't want to not answer any more questions that you have. I think you're good. Okay, thank you. May it please the court, Josh Robbins from the Buckhalter Law Firm for Whitewater West. Before we get too into abstractions about the prior doctrine, I wanna be clear, I think it's clear already, what exactly PST has alleged in this case. And in the briefs, they talk about this broader, overarching scheme, but as I think the courts recognize, that's really two things. It's the alleged sham litigation, the prior litigation, and then several statements that they allege Whitewater made to others about the litigation. That's it. There's nothing beyond that, and 99% of that is the prior litigation. Those several statements that they allege Whitewater made are not alleged to be false statements, and under this court's test in Harcourt Brace, which we've cited, there's never been any dispute among the parties in this case that those separate statements would not rise to an antitrust violation or come close to it under the six part Harcourt Brace test. As to the prior litigation, as we pointed out, and I think as Judge Beatty astutely noted, it's really two lawsuits, and even the district court in the trial in this case recognized it wasn't really five lawsuits. And those were cases in which both district judges involved had responded to arguments by PST that they were brought in bad faith and that they were frivolous and had rejected those arguments and said, no, they were brought for legitimate purposes. In one of the cases, they actually... Whitewater won a trial, and then it was reversed on an issue of first impression in the federal circuit. So that's the conduct that we're talking about. What PST is asking you to hold in this argument they make about continental ore and monopoly broth, to ask you to hold for the first time of any court that we know of, is that non sham litigation is effectively not immune under Pennington if the plaintiff has alleged something else, anything else as supposedly part of anti competitive conduct. Even something as limited as the several statements they claimed that Whitewater said that were not false statements. Not only is there no precedent for that proposition, that is foreclosed by Pennington itself. The Supreme Court in Pennington, which is the namesake of the Noor-Pennington Doctrine, specifically held that a jury could not consider immunized petitioning conduct along with other kinds of conduct as part of a broader scheme. It specifically said that the jury had to be instructed not to consider that petitioning conduct as part of a broader scheme, and that to fail to instruct the jury accordingly was itself a reversible error. What PSD is proposing here is the opposite, to say that it would be a reversible error not to instruct the jury that it must consider the immunized conduct along with the rest of it. That's foreclosed by Pennington, it's foreclosed by the Supreme Court's decision in Linkline that was cited, by this court's decision in Dreamstime, which also said you can't combine clearly lawful conduct with other clearly lawful conduct and make an unlawful antitrust violation. And it would result in absurd results. It would lead to absurd results because it would mean essentially that there is no Noor-Pennington Doctrine, there is no immunity for non-SHAM litigation as long as something else is alleged. And it's not very difficult for a plaintiff in an antitrust case to allege something in addition to the petitioning conduct to get around Noor-Pennington. And if they allege that, and they allege that it was done with anti-competitive intent, that's it. You no longer get Noor-Pennington protection, you are under this, the jury instruction... Sorry, the verdict form question that they are proposing that the jury was supposed to decide, which is this broad, amorphous concept with no guidance for the jury. And no one would have the benefit of Noor-Pennington, and you would see any number of retaliatory lawsuits going forward against anyone who tries to enforce any of their rights, patent or otherwise, in court. The other point we've made is that this court doesn't need to reach that issue because PSD has effectively waived it, and a minimum not preserved it through objections. If you look at the record, 2 ER 76-77, that's in the instructions, the last version of the instructions that PSD proposed to the district court. And there they said that Noor-Pennington would be a complete defense unless it was sham litigation, and they said, quote, the jury would be further instructed that if it finds that Whitewater's conduct viewed as a whole, but without immunized lawsuits, was insufficient to show willful maintenance of monopoly power, then it should render a verdict for Whitewater. Well, that's not what they're saying on appeal. What they're saying on appeal is that it must be considered with immunized lawsuits, and that you don't take the non-sham litigation out of the equation. But that's what they told the district court in their proposed written jury instructions. So at most, there would be... Even if the court thought that it was error not to give what they proposed, it would be invited error, and it would be waived. Aside from waiver, the district court gave the parties two separate chances after the district court had disclosed the instructions that it proposed to give. It gave the parties two separate chances on two consecutive days, that's August 24th and August 25th, the last two days of trial, to raise any objections or concerns that they had about the instructions that the court was proposing. And at no time in any of that, did PSD raise any objections or issues with respect to this monopoly broth or this broader holistic concept issue that they're raising now. That was not discussed. And that, under Rule 51 and this court's decision in Skidmore v Led Zeppelin, would mean that they have not preserved the issue, and plain error would apply, and they did not argue that they would meet a plain error test. So are there any... What would you say are the limiting principles on a monopoly broth theory? Does some of the conduct have to be illegal or anti competitive? I understood your earlier comments to be that you can't group together a series of lawful acts and then say you have an anti competitive, unlawful acts. Yes. I'm not sure the case law is as clear on that point. So what would you say are the limiting principles, and what do you rely on for that? Yes. Continental law, which is where this whole concept starts, is often misunderstood. The term monopoly broth comes from the Seventh Circuit decision that's discussing continental law, but it's kind of been... And a number of litigants and some district courts have misconstrued continental law, and there's an entire very good law review article about it that we cited in the brief. What continental law says is that you can... Not that you can combine different types of definitely lawful conduct to make an unlawful whole, it's that if you have conduct that may or may not be unlawful, but has a certain effect that by itself would not be enough to harm competition. There's a different element of a Sherman Act Section 2 claim that has to harm competition. If you have conduct A, that by itself doesn't have a significant enough effect to harm competition, and conduct B, that by itself doesn't have that effect, and conduct C, you can look at the combined effects that those different elements of conduct have, and whether or not together they affect competition. So it's the effects, it's the combined effect of them, not whether or not they're different types of lawful activity that amount to willful maintenance of monopoly power if you put them together. So it goes to a different element of the Sherman Act Section 2 claim, and that's how the Continental Or Rule is applied. And if you look at a number of the cases that are cited, including ones that they cite with respect to continental or, that's how they're applied, is you look at whether or not the effects of these different things together can meet the element of the required harm to competition. But if you look at link line, which is where the Supreme Court looked at two different types of pricing conduct, one at the retail level and one at the wholesale level, the Supreme Court said, Well, neither of those by itself is unlawful, meets the tests that we have set out for when this kind of pricing is willful maintenance of monopoly power, or this kind of pricing is. And when you look at them together, you can't take those two and put them together and say, Well, now it is unlawful. That's what it said. In Dream's time, that was a case involved in Google, and it was alleged that it had done these various different things that altogether were a violation. And this court said, Well, no, each one of those things is lawful under our case law. You can't say now that because they did a number of them, we can look at it as unlawful. I think the concept was zero plus zero equals zero. It doesn't equal one. As to... I do wanna make sure with the time left, I touch on a couple of the other issues. You discussed a bit the clear and convincing question. This court set out the standard in the Hangard's case, clear and convincing. There is no decision, not City of Anaheim, not any other case, that has said that Noor Pennington is decided under a lower standard than set out in Hangard's. Hangard's did not concern the Walker process claim that Mr. Martin referred to, which is where the allegation is that the patent was obtained through fraud. It actually concerned the same types of allegations as in this case, which is that sham litigation was being used in some predatory fashion to put too much pressure on the competitor. And the test that it set out was clear and convincing. And that's an appropriate test because what Noor Pennington protects is First Amendment activity, the right to petition the government, whether it's the executive branch or the judicial branch to address grievances. And that's something that this court has said repeatedly in Noor Pennington cases, has to be over protected, if necessary, to avoid chilling parties' rights to go to court to vindicate their rights. And that's why you have this clear and convincing standard. It's to ensure additional protection and avoiding that chilling effect. The argument that they've made in their briefs, that PSD has made, is that, well, that only applies strictly when it's just a certain type of patent case. Well, there's no court, certainly within this circuit, that has ever said that. We're not aware of any court outside that has said that it's limited to that. But even if it were, this is a patent, this was patent litigation. Not just the litigation in front of Judge Benitez, that the four that were really one, the other case was also a patent litigation. We've called it the contract case because there was a contract claim in it. There were also patent claims. That's why when it was appealed, it went to the Federal Circuit, because there were patent claims about inventorship of patents in that case as well. And the contract claim had to do with ownership of patents. So this was really patent litigation, all about patents through and through. Even if you accepted PSD's proposed limitation of hand guards, based on no precedent that we know of. Even if we accepted that, then it would still fall within that test and it would be clear and convincing. The other point that I make about the clear and convincing standard, or whatever standard of proof we're using, is it really doesn't matter at the end of the day. This goes to the harmless error point. First of all, objective baselessness, which does apply here, whether you think it's POSCO or not, and we think under relevant group, it's clearly not the POSCO approach. Objective baselessness is a question of law to be decided by the court. The court said that in relevant group. The Supreme Court has said that that's really not a question. That was for the court to decide. And it did decide that, and so did Judge Subraw in the other case. They had addressed those things before. This was not baseless litigation. The cases went to trial, and Whitewater one on one trial, lost on the other, and then had a reversal. But they already said that these were not baseless, frivolous lawsuits. And that issue should never have gone to the jury at all. I mean, if there was an error, it was even allowing this to get to a jury instead of dismissing it or having a Rule 50 decision. As we pointed out, the district court did entertain the Rule 50 motion and deferred it on this point until after the jury verdict. We suspect that it would have been granted. We certainly think it should have been granted because the issue of sham litigation should never have had to go to the jury in the first place. That should have been eliminated. All that was left was the supposedly disparaging conduct, which PSD has never alleged, could by itself amount to an antitrust violation. And with a few seconds left, just as to the objective baselessness, again, we think relevant group clearly controls. This would be under the standard PRAI test. But even if you use the POSCO test, there's a requirement of objective baselessness in that as well. It has to be a series of baseless lawsuits. It's not only about bad faith, subjective intent. Unless the panel has any other questions, we would submit with that. Thank you. We have your argument. You have a few minutes left for rebuttal. Thank you. Just a few points. First of all, I've been thinking about the dismissed and refiled question you raised earlier. And I just keep reverting to the policies of the competition laws. If it were the rule that you could file a lawsuit, dismiss it, file a lawsuit, then dismiss it, file a lawsuit, then dismiss it, that would have a pretty chilling effect on competition. But wouldn't that be accounted for in the Noor-Pennington Doctrine in the sham litigation exception? So you're talking about competing policies here, a concern arising under statute to preclude anti competitive conduct and a First Amendment right to petition the courts. Yeah. That is one of the... That's the tricky part of this case. I mean, it is tricky and it was difficult for the judge and these are interesting facts. I think they are facts that will pop up again and again in the context of patent litigation and in tech litigation. But if a monopolist, in order to get to these things, you have to prove that it's a monopolist, that this entity already has the market power and the ability to squeeze out competitors. And we want people to compete. But allowing them to file a lawsuit and then dismiss it, file a lawsuit and dismiss it, it has the same chilling effect on the rival. They're still raising their costs, they're still fending off litigation, rather than competing. And the whole point of this is when a rival comes in, the monopolist should react by saying, I'm gonna give you a better deal, I'm gonna give you better services, I'm gonna give you better prices. We didn't see any of that in this case. It was, we're gonna file a lawsuit, we're gonna use it to complain about you. We dismissed it after we had achieved our objectives, after folks had already, in the most important time in PSD's history, they were labeled and the evidence was a liar, a fraud. They weren't gonna survive it. Every customer, every customer knew. And the evidence was, customers talked. Every customer knew that PSD was being targeted by these folks. And it was a five year series of lawsuits, and that series of lawsuits was supplemented by all of these comments to customers specifically. And there's not a ton of customers out there. So it is this combined effect that is what concerns me, and that's why I started off saying, it's not just PSD that's here. It's every rival that's trying to get in the market. And knowing where, it will be helpful to know where the guidance is on the lines of, in particularly POSCO and in the evidence as a whole test. And going back to the clear and convincing evidence standard, I don't know of any case that clear and convincing evidence was used for any case in POSCO. I just don't think it's come up. I only know it's come up in that hand guard's decision. And if you look at the hand guard's decision, they talk about how they are using that standard, because it's derived from the statutory presumption of validity in that particular kind of case. I think we have your argument. Okay, that's it. And thank you so much for listening to us. The case of Pacific Surge Designs versus Whitewater Wells is submitted.
judges: BYBEE, IKUTA, BADE